[No. 33091-8-I.   Division One.   January 30, 1995.]

CHARLES W. KLOSS, *Respondent*, v. HONEYWELL, INC., *Appellant.*

*Mary L. Gaudio,* for respondent.

*Wayne W. Hansen, Michael B. King,* and *Timothy J. Pauley* of *Lane Powell Spears Lubersky,* for appellant.

WEBSTER, J. — Honeywell, Inc., appeals a judgment in favor of Charles W. Kloss, alleging the court erred in finding a written contract, the suit was barred by the 6-year statute of limitations, and Kloss failed to mitigate his damages. We affirm.

## FACTS

Charles W. Kloss sued his former employer, Honeywell, for breach of contract in which Honeywell promised to place him in the position of industrial nurse upon completion of an educational program to obtain a registered nurse degree. The trial court found Honeywell had breached the contract and awarded Kloss $130,084.50 in damages and $29,467.75 in costs and attorneys' fees.

Kloss began his employment with Honeywell in October 1967. By the late 1970's he held the position of plant engineer in Honeywell's Marine System Division (MSD). Kloss remained in that position through spring 1983. In late 1983, Honeywell was planning to transfer its employees from Ballard to its Harbour Pointe facility. Aware that Honeywell anticipated hiring a medical person at Harbour Pointe, Kloss met with director of employee and community relations Curtis L. White, and asked to be assigned to the position. After discussing the matter with Kloss's supervisor, James Messner, and Messner's supervisor, James Durand, White advised Kloss that if he enrolled into a nursing program, the company would pay for his tuition under its tuition reimbursement policy.

In September 1983, Kloss met with Adam Heller, human resources development manager, and Messner to coordinate his work schedule with his nursing program. According to Heller, neither he nor Messner stated that if Kloss completed the nursing program he would be given a job as a nurse. Kloss testified such a commitment was made at the meeting.[1] Messner drafted a memorandum to Durand confirming what transpired at the September 23 meeting. In January 1984, Kloss entered the licensed practical nurse (LPN) program at Seattle Central Community College.

---

[1]Based on Kloss's discussions with White, Heller, Messner and Durand, the trial court found that Honeywell entered into an oral agreement in which Honeywell promised Kloss that if he completed his nursing education, it would pay the cost of the training and would hire him into a health care position at its Harbour Pointe facility. While Honeywell argued at trial that no oral contact was reached between Honeywell and Kloss, on appeal it does not dispute the court's finding that there was an oral contract.

Meanwhile, Honeywell's corporate medical department recommended that the medical position at Harbour Pointe be for a registered nurse (RN). White decided that the medical position at Harbour Pointe should be filled by an RN rather than an LPN. Heller wrote a memorandum to Durand and Messner with copies to Kloss and White stating the medical position at Harbour Pointe should be filled by an RN and that Kloss's education should be directed to that end. Kloss then focused his nursing education on becoming an RN.

Honeywell had completed transfer of its MSD operations from Ballard to its Harbor Pointe facility in the fall of 1985. The facility had an immediate need for a medical person, and Kloss had not yet acquired his nursing degree. Dorothy Martin, a Honeywell employee and an LPN, was assigned to the position.

After Kloss became aware of Martin's assignment, he met with White, in March 1986. White reminded Kloss of the downsizing that Honeywell was experiencing at the time and told him that Martin's position was in jeopardy. He explained that he could not guarantee a medical position. White stated that since he had been notified he was being transferred to another Honeywell facility, Kloss would have to speak to his successors about any such positions.

Kloss graduated from his RN nursing program in June 1986. Honeywell did not assign him to a nursing or medical position. Kloss returned to work in the company's maintenance department. In February 1987, Kloss was granted a voluntary layoff.

Kloss filed his complaint almost 5 years after he graduated from the nursing program, not having been offered a nursing or other medical position at Honeywell. The court found a written employment contract and awarded Kloss lost wages as damages.

I

Honeywell claims Kloss's suit was untimely, alleging that the contract was insufficient under the 6-year statute of

limitations because the memoranda lacked a compensation term. Ex parte writings are sufficient to bring a contract within the 6-year statute of limitations if the writing contains all of the elements of a contract. *Cf. Cahn v. Foster & Marshall, Inc.*, 33 Wn. App. 838, 841-42, 658 P.2d 42, *review denied*, 99 Wn.2d 1012 (1983); *Evans v. Yakima Vly. Grape Growers Ass'n*, 52 Wn.2d 634, 644, 328 P.2d 671 (1958). A written agreement for purposes of the 6-year statute of limitations must contain all the essential elements of the contract, and if resort to parol evidence is necessary to establish any material element, then the contract is partly oral and the 3-year statute of limitations applies. *Cahn*, 33 Wn. App. at 840-41.

■■ Honeywell claims a valid employment contract cannot exist without an express agreement on the amount of compensation. Kloss disagrees. Employment contracts are governed by the same rules as other contracts. *Comfort & Fleming Ins. Brokers, Inc. v. Hoxsey*, 26 Wn. App. 172, 176, 613 P.2d 138, *review denied*, 94 Wn.2d 1008 (1980). "A unilateral contract [such as the one here] consists of a promise on the part of the offeror and performance of the requisite terms by the offeree." *Multicare Med. Ctr. v. Department of Social and Health Servs.*, 114 Wn.2d 572, 583, 790 P.2d 124 (1990). The "consideration consists of the offeree performing the requisite terms of the offer." *Multicare*, 114 Wn.2d at 584. The essential elements of any contract which must be set forth in writing are "the subject matter of the contract, the parties, the promise, the terms and conditions, and (in some but not all jurisdictions) the price or consideration". *Family Med. Bldg., Inc. v. Department of Social & Health Servs.*, 104 Wn.2d 105, 108, 702 P.2d 459 (1985).[2]

Occasionally, those who offer or agree to employ others, or to buy goods, will make no statement as to the wages or price to be paid. In such a case, the law invokes a standard of reason-

---

[2]Statute of frauds cases are considered to be helpful in determining if the writings in "statute of limitations" cases are sufficient. *Evans*, 52 Wn.2d at 645.

ableness so that the fair value of services or property is recoverable. . . .

. . . .

. . . Thus, in some jurisdictions a promise that one shall be well paid or providing for sufficient monies is interpreted as a promise for reasonable compensation, and a promise to pay a good or living wage has also been upheld. . . .

In short, though the necessity for definiteness may compel the court to find the language used is too uncertain to be given any reasonable effect, when the parties' language and conduct evidences an intention to contract, and there is some reasonable means for giving an appropriate remedy, the court will strain to implement their intent. Thus, if a promise indefinite as to price is capable of being made certain by an objective standard through extrinsic facts, it will be enforced.

(Footnotes omitted.) 1 Samuel Williston, *Contracts* § 4:22, at 507-09, 518-20 (4th ed. 1990).

RCW 4.16.040(1) applies a limitations period of 6 years to "[a]n action upon a contract in writing, *or liability express or implied arising out of a written agreement.*" (Italics ours.) This language is very broad in its scope and

differs from the statutes of limitation of most, if not all, other states . . . [in] that an *implied liability* arising out of a written instrument is included in the same clause with an *express liability* arising out of a written contract.

*Evans*, 52 Wn.2d at 645.[3]

■ ■ As a result, what is normally regarded as a necessary element of a written contract need not be expressly addressed if it is implicit in the writing, and the fact that the obligation is implicit in the writing does not cause the contract to be "partly oral" for statute of limitations purposes. "The general rule is that failure to agree upon the precise amount of compensation does not defeat the existence of a contract. In other words, once the *fact* of compensation is established, failure to agree upon the precise degree of compensation does not vitiate the performing party's right to reasonable compensation." *Rutcosky v. Tracy*, 89 Wn.2d 606, 610, 574 P.2d 382 (1978) (en banc), *cert. denied*, 439 U.S. 930

---

[3]Since no written instrument had been produced the court could find no liability either express or implied. *Evans*, at 635.

(1978).[4] Other jurisdictions similarly uphold obligations which are implicit in contracts.[5]

Honeywell does not dispute that the writing established the subject matter of the contract, the parties, and the promise of employment. Implicit in the agreement to employ Kloss as a nurse is the obligation to pay him for that work. Thus, this writing acknowledges a state of affairs from which it can fairly be implied that the contract imposes an obligation to pay Kloss a reasonable salary. Kloss provided the consideration for the agreement by performing, obtaining his nursing degree. Honeywell's action in paying for Kloss's nurse's training shows very forcefully that it intended to bind itself by its "offer" to hire him as a nurse.

Since the amount of compensation need not be specified for a contract to be enforceable, and this writing establishes that compensation was to be paid, the writing was sufficient to bring the contract within the 6-year statute of limitations. The trial court was entitled to invoke its equitable powers to determine a reasonable amount of compensation. *Rutcosky*, 89 Wn.2d at 610.

## II

█ Honeywell next claims that Kloss failed to mitigate his damages because he requested and was granted a voluntary

---

[4]*See also Sanwick v. Puget Sound Title Ins. Co.*, 70 Wn.2d 438, 423 P.2d 624, 38 A.L.R.3d 315 (1967). Escrow instructions were sufficient to hold title insurance company liable for negligently drafting real estate contract even though the instructions had not provided for the title company to draw up the contract; duty was implicit in the escrow instructions. *Sanwick*, at 444.

[5]*See International Printing Pressmen & Assistants' Union v. Smith*, 145 Tex. 399, 410-11, 198 S.W.2d 729, 736 (1946) (it is sufficient if the obligation or liability grows out of a written instrument, not remotely but immediately, or if the written instrument acknowledges a state of facts from which by fair implication, the obligation or liability arises); *Fey v. Loose-Wiles Biscuit Co.*, 147 Kan. 31, 35-36, 75 P.2d 810, 812-13 (1938) (letter offering to match offer of compensation employee received from another company sufficient for statute of limitations purposes); *D.N. Corp. v. Hammond*, 685 P.2d 1225, 1231 (Alaska 1984); *Arizona Bd. of Regents v. Arizona York Refrigeration Co.*, 115 Ariz. 338, 341, 565 P.2d 518, 521 (1977) (once a contract was formed whereby insurer agreed to performance of additional repairs, it obligated itself to pay for their reasonable value); *Allred v. Lininger*, 156 Colo. 341, 345, 398 P.2d 967, 969 (1965) (in absence of agreed price, the court is required to determine the price on the basis of reasonable value).

layoff from his job at Honeywell. "The doctrine of mitigation of damages . . . prevents recovery for those damages the injured party could have avoided by reasonable efforts taken after the wrong was committed." *Bernsen v. Big Bend Elec. Co-op., Inc.*, 68 Wn. App. 427, 433, 842 P.2d 1047 (1993). " *'If a choice of two reasonable courses presents itself, the person whose wrong forced the choice cannot complain that one rather than another is chosen.'* " *Gillespie v. Seattle-First Nat'l Bank*, 70 Wn. App. 150, 174, 855 P.2d 680 (1993) (quoting *Hogland v. Klein*, 49 Wn.2d 216, 221, 298 P.2d 1099 (1956)), *review denied*, 123 Wn.2d 1012 (1994).

We have adopted the following mitigation principles from federal case law:

> [1] [T]he burden of proving a failure to mitigate damages . . . [is] on the defendant. . . . To satisfy its burden, the [employer] must show that there were suitable positions available and that the plaintiff failed to use reasonable care and diligence in seeking them. [2] Self-employment does not necessarily indicate a lack of reasonable diligence, nor is a discharged employee required to seek employment similar to the work he performed for his previous employer. The reasonableness of the effort to find substantially equivalent employment should be evaluated in light of the characteristics of the individual and the job market. [3] Success is not required, nor is the failure to earn a substantial income dispositive of the question of whether a terminated employee exercised reasonable diligence.[6]

(Citations omitted.) *Burnside v. Simpson Paper Co.*, 66 Wn. App. 510, 529-30, 832 P.2d 537 (1992), *aff'd*, 123 Wn.2d 93, 864 P.2d 937 (1994).

In *Burnside*, the employee did not fail to mitigate his damages, even though he did not make an ongoing concerted effort to find employment comparable to that from which he had been terminated. No evidence had been presented that such employment was in fact available and it would have been futile for plaintiff to request reinstatement in his previous position. *Burnside*, 66 Wn. App. at 530.

■ The following principles are useful in evaluating mitigation and voluntary termination of employment:

---

[6]"To show a willful loss of earnings an employee must refuse a job substantially equivalent to the one he was denied." *Burnside*, at 530 n.19.

(1) Where an employee has been unlawfully discharged, his duty to mitigate damages requires that he be "reasonably diligent in seeking and accepting new employment substantially equivalent to that from which he was discharged."

(2) The employee is not required to "go into another line of work, accept a demotion, or take a demeaning position" to mitigate his damages.

(3) The duty to mitigate damages does include the obligation to accept a " 'job substantially equivalent to the one he was denied' ".

(4) Once the employee has accepted such a job, the duty of mitigation "includes the obligation to make reasonable and good faith efforts to maintain that job once accepted".

(5) Even where the employee's interim employment is comparable to that which he was denied, "the rule that voluntary termination of interim employment tolls the back pay period is not unqualified. Thus, a voluntary quit does not toll the period when it is prompted by unreasonable working conditions or the earnest search for better paying employment." *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273-78 (4th Cir. 1985) (applying section 706(g) of the Civil Rights Act of 1964).

Thus, voluntary termination of employment tolls the back pay period only if the terminated employment is comparable to that which the employee was denied by the employer.[7]

Honeywell provided no proof on mitigation of damages other than the fact of Kloss's voluntary layoff from the nighttime maintenance position. It concedes that position was not

---

[7]Cases cited by Honeywell do not stand for a different rule. *See Wisconsin Ave. Nursing Home v. District of Columbia Comm'n on Human Rights*, 527 A.2d 282, 292 (D.C. 1987) (where discharged nursing assistants subsequently obtained similar employment with another employer only to be laid off, the court noted that the rule regarding voluntary termination has no application in cases of layoff); *Sims v. Mme. Paulette Dry Cleaners*, 638 F. Supp. 224, 229 (S.D.N.Y. 1986) (back pay award diminished by losses which the employee voluntarily incurs, such as voluntary termination, but this rule is not applicable where the employee is fired due to making a mistake on the job); *Department of Corrections v. Finley*, 575 N.E.2d 1026, 1028-29 (Ind. Ct. App. 1991) (wrongfully discharged employee, subsequently hired into a similar position at a different facility, but then also fired from the latter position).

substantially equivalent to either the nursing position he was denied or to the plant engineer position, which he had formerly held. Further, had Kloss remained in the custodial position indefinitely, it could reasonably be argued he failed to mitigate his damages by not attempting to secure comparable employment.

Honeywell asserts that Kloss's only reason for asking for a voluntary layoff was his altruistic purpose of saving "a job for someone with family responsibilities". However, Kloss also testified that his job, following his graduation from nursing school, consisted primarily of "painting walls and hanging plaques". He felt humiliated remaining at Honeywell and doing such menial jobs given his prior position with the company. In the months after he graduated Kloss worked as a custodian. He was provided no assistance in either getting back his prior position as plant engineer, nor had he received any indication that he might be transferred to a health care position. In addition, Honeywell does not dispute the court's finding that Kloss would probably have been discharged even had he remained.

Moreover, the point of limiting recovery of back pay, where there has been a voluntary termination from a subsequent position, flows from the fact that back pay is a " 'make whole' remedy", intended to return the claimant to the financial position he would have been in had the initial unlawful firing (or, in this case, breach of contract) not occurred. *Brady*, 753 F.2d at 1278. The duty to mitigate does not extend to requiring conduct which is unreasonable (such as accepting, or remaining in a position not comparable to the position the employee was promised) nor does it require actions which are futile. Honeywell does not challenge the reasonableness of Kloss's efforts to mitigate his damages by searching for and accepting various positions, including self-employment, after his termination.

If Kloss had been unlawfully terminated, either from his previous position as plant engineer, or any health care position, it could not reasonably be argued that his duty to mitigate damages would have required him to take a main-

tenance position. Kloss did not breach his duty to mitigate damages by leaving that position. Kloss was required to and did make reasonable efforts to mitigate his damages.

Kloss requests the award of attorneys' fees pursuant to RCW 49.48.030 which provides that

> [i]n any action in which any person is successful in recovering judgment for wages or salary owed to him, reasonable attorney's fees, in an amount to be determined by the court, shall be assessed against said employer. . . .

■ "[A]ttorney fees are recoverable in actions for lost wages for breach of employment contract." *Gaglidari v. Denny's Restaurants, Inc.*, 117 Wn.2d 426, 450, 815 P.2d 1362 (1991). Accordingly, Kloss is entitled to attorneys' fees.

We affirm and award attorneys' fees to Kloss pursuant to RAP 18.1 and RCW 49.48.030.

BAKER, A.C.J., and BECKER, J., concur.